IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-74,721




 


RANDY ETHAN HALPRIN, Appellant



v.



THE STATE OF TEXAS






ON DIRECT APPEAL

FROM CAUSE NO. F01-00237-T FROM THE 283RD DISTRICT COURT

DALLAS COUNTY





 Hervey, J., delivered the opinion for a unanimous Court.



O P I N I O N


 Appellant and six other prison inmates (the "Texas Seven") escaped from prison in December
2000. These prison escapees murdered a police officer during a robbery at an Oshman's sporting
goods store on Christmas Eve 2000. As a result of this incident, appellant was charged with capital
murder. A jury convicted appellant of this offense, and the trial court sentenced appellant to death
pursuant to the jury's answers to the special issues submitted at the punishment phase. Appellant
raises nineteen points of error. We affirm.

 In point of error one, appellant asserts that the trial court improperly excluded mitigating
evidence in violation of Article 37.071(f)(4), Tex. Code Crim. Proc., which requires that the jury
be instructed that it "shall consider mitigating evidence to be evidence that a juror might regard as
reducing the defendant's moral blameworthiness." In point of error two, appellant also asserts that
the trial court improperly excluded this mitigating evidence in violation of the Eighth Amendment
to the United States Constitution.

 In these points of error, appellant claims that the trial court erroneously excluded mitigating
evidence in the form of a document offered as defense exhibit 39. Appellant argues that this
document "gave weight and credence to part of [his] mitigation argument: that is, he was not the
leader of the Texas Seven; he was not a principal in the decision to break out of prison; and, he was
not a principal in the decision to robb [sic] Oshmans."

 The top of this document states, "TDCJ Connally Unit." It ranks appellant the lowest of the
Texas Seven in leadership qualities. The identity of the person who prepared the document is
unknown. (1) In relevant part, the document declares:

Ranking of Offenders by Leadership/Personality Characteristics


 After conducting interviews with civilian workers, correctional officers, and several
inmates who worked closely with the escapees, a consensus was developed of which
offender was the leader and which one may be the weakest. It was unanimous
decision that RIVAS[ (2)] was the leader and the weakest was determined to be
[APPELLANT]. The following are ranked in order from highest (leadership) to the
lowest (follower).

 . . . . . . . . . .


 7. [APPELLANT]-was quiet and never exhibited leadership qualities. Was
consistently worried about whether his work was acceptable to the civilian workers. 
Very submissive characteristic. This worrisome attitude was seen to escalate a month
before the escape. One civilian worker speculated whether [APPELLANT] was
undergoing some type of depression.


 The trial court sustained the prosecution's hearsay objection to the document each time
appellant offered it into evidence. For example, during the punishment phase of the trial, the trial
court sustained the prosecution's hearsay objection to the document when appellant offered it under
the business records exception to the hearsay rule. (3)

 [DEFENSE]: Judge, out of the presence of the jury, I'll make a record as to Defense
Exhibit No. 39 that's been admitted for record purposes at this point. We've talked
about that quite a bit during the course of the trial and I just want to state for the
record that Defense Exhibit 39 at the top says, it's ranking of offenders by leadership
slash personality characteristics. It says that "After conducting interviews with
civilian workers, correctional workers, and several inmates that work closely with the
escapees, a consensus was developed of which offender was the leader and which one
may be the weakest" and talks about what the decision was. It ranks the offenders
from the highest to the lowest, starting with Rivas as the highest and [appellant] as
the lowest.


 First of all, Your Honor, this document is a part of the discovery that the State gave
to us. It has a distinctive number of 1550 on the bottom, which indicates what
number of document it is that the State gave to us. This is not a document that was
subpoenaed by the defense. It was given to us by the State.


 Because it says that it's a summary that was compiled after talking to several
different people, civilian workers, correctional officers, and inmates, it's not going
to be the document of any one particular person. It's going to be a TDC document.


 Now, witness Moczygemba, who was a TDC civilian worker who was taken down
in the escape, testified that he remembered they were asked to do this type of ranking. 
Also another TDC worker who was taken down in the escape, and that would be-that
would be Mr. Burgess, also seemed to remember being asked that sort of
information. The document clearly says "TDCJ Connally Unit" on the top of it.


 Now, yesterday [the defense] tried to offer that exhibit through the witness who came
from the Inspector General's Office, Elizabeth Mullen. Ms. Mullen also testified that
that appeared to be a TDCJ document. It says TDCJ Connally Unit on the top. Ms.
Mullen said what they do, their job at the Inspector General's Office, is to investigate
all of these types of matters and compile documents, reports, and such that are related
to matters such as the escape.


 And she says, I just don't recognize this one. Now, she also testified that, you know,
she's told by her general counsel not to come here and, you know, give anything to
the defense that the defense may have subpoenaed until she talks to the State first.


 Judge, one thing I did omit, Mr. S.O. Woods, a former TDCJ employee, said he went
to the Inspector General's Office, he reviewed the several documents that they had,
the boxes of documents that he had, and he recalled seeing this document amongst
those papers.


 [TRIAL COURT]: [Defense counsel], I don't believe that's an issue. It's a TDCJ
document. No question about its authenticity. That's not the issue. The issue is that
the conclusions on the entire document are all from hearsay from unnamed sources. 
That's the problem with the document.


 [PROSECUTION]: We didn't know who made it, either.


 [TRIAL COURT]: You don't know who the author is, you don't know where the
conclusions came from, you can't go back and find out any of the source information
that that ultimate opinion comes from.


 So I have reviewed 39, I understand your objections. No question about its
authenticity. It's simply not admissible because of hearsay.


 [DEFENSE]: Well, Judge, our objection would be-I mean, our premise would be that
you do have some evidence from Moczygemba and Bender where the data came
from, that it's a business record of TDCJ, and that the proper sponsoring witness for
that would be Ms. Mullen, except that she says I just don't recognize this particular
one.


 So that puts us in the position of having to rely on the State for our sponsoring
witness for the document, but having that sponsoring witness say, well, I just don't
recognize this particular one, even though Mr. Woods says that he saw it amongst
those papers in the Inspector General's Office.


 [TRIAL COURT]: The record is clear as to the Court's ruling. Sheriff, find us a jury.


 [DEFENSE]: Judge, just so I'm clear, is the Court saying that that document offered
through Ms. Mullen is objected to by the State as hearsay and, therefore, the Court
is not admitting it as a business document made during the course and scope of the
record keeping duties of TDC?


 [TRIAL COURT]: It may be a business record, but it's all hearsay.

 

 We find that the trial court did not abuse its discretion to decide that the document did not
meet the business records exception to the hearsay rule. There is no evidence showing who prepared
the document or whether it is a record of regularly conducted activity. In addition, the record also
reflects that appellant presented from other sources a significant amount of mitigating evidence that
was cumulative of the mitigating evidence contained in the document. A TDCJ civilian employee
(Moczygemba) testified that he would rank appellant's intelligence "at the very bottom" of the Texas
Seven. (4) Another TDCJ civilian employee (Burgess) testified that appellant was not "a leader type." (5) 
Appellant also testified at length that he was a follower and not a leader and that his participation
in the victim's murder was minimal. Appellant's counsel also argued appellant's lack of intelligence
and leadership qualities to the jury during closing jury arguments at the punishment phase. (6) Under
these circumstances, any error in excluding the document was harmless (even beyond a reasonable
doubt). Cf. Leday v. State, 983 S.W.2d 713, 718 (Tex.Cr.App. 1998) (overruling objection to
evidence is not reversible error when other such evidence is admitted). Points of error one and two
are overruled. 

 In points of error three through ten, fourteen and seventeen, appellant claims that the trial
court erroneously denied his challenges for cause to ten veniremembers during the voir dire process
to select the primary jury panel. The record, however, reflects that appellant had one peremptory
challenge remaining when he accepted the twelfth juror (Dalton).

 [TRIAL COURT]: Back in open court. In the presence of [appellant], what says
[appellant]?


 [DEFENSE]: Judge, I need to put something on the record, if I may.


 [Appellant], Mr. Ashford and I have advised you that we have burned our 15 strikes
and the Court has granted us one additional strike. And we discussed with you that
we can burn a strike, if you wish, on Mr. Dalton, or, if we do burn a strike for some
particular reason, you can always ask the Court for an additional strike somewhere
down the line.


 There's no guarantee the Court would give us a strike and we've discussed those
issues with you; is that correct?


 [APPELLANT]: Yes.


 [DEFENSE]: In understanding those issues and understanding that you have one
strike left, you have advised Mr. Ashford and myself that Mr. Dalton is acceptable
as a juror to you; is that correct?


 [APPELLANT]: That's correct.


 [DEFENSE]: You understand that some people might argue that by giving up one of
your strikes, even though it's an additional strike the Court has given us, that
somehow you are waiving some error. But I have explained to you, have I not, that
what the Court will look at is the twelve jurors that you have in the box to determine
whether or not you have been harmed somehow, even if the Court has previously
made and denied an erroneous charge by the defense that would be error, the Court
or the Court of Appeals, Supreme Court of the United States, would look to see
whether you were harmed by that error and in ascertaining that, look and see which
twelve individuals you have in the box. And I have explained that to you?


 [APPELLANT]: Yes, sir.


 [DEFENSE]: And you understand there's some trial strategy involved here in
accepting jurors as well and you are aware of the trial strategy of burning strikes and
some of the other matters that we have been engaged in in the last six weeks; is that
correct?


 [APPELLANT]: That's correct.


 [DEFENSE]: And understanding all of that, it's your desire to accept Mr. Dalton; is
that right?


 [APPELLANT]: That's correct.


 [DEFENSE]: We accept Mr. Dalton as juror No. 12.


 Appellant, therefore, suffered no harm from any error in the trial court's denial of these ten
challenges for cause. See Johnson v. State, 43 S.W.3d 1, 7 (Tex.Cr.App. 2001) (to show harm from
erroneous denial of defense challenge for cause, defendant must show, among other things, that he
exhausted all of his peremptory challenges). Points of error three through ten, fourteen and
seventeen are overruled.

 In points of error eleven through thirteen, appellant claims that the trial court erroneously
denied his challenges for cause to three veniremembers during the alternate juror selection process
which was separate and distinct from the process to select the primary panel. See Article 33.011(a),
Tex. Code Crim. Proc.; Article 35.15(d), Tex. Code Crim. Proc. Appellant, however, has not
shown that any of the two alternate jurors (Hoyer and Railsback) participated in any of the jury
deliberations in his case. Appellant, therefore, suffered no harm from any error in the trial court's
denial of these three challenges for cause. See Cooks v. State, 844 S.W.2d 697, 721-22
(Tex.Cr.App.), cert. denied, 509 U.S. 927 (1993). Points of error eleven through thirteen are
overruled.

 In points of error fifteen, sixteen, eighteen and nineteen, appellant claims that the trial court
allowed the prosecution to ask four veniremembers improper commitment questions during the
process to select the primary jury panel. (7) In point of error fifteen, appellant claims that the following
was an improper commitment question from the prosecution to veniremember Russell.

 Q. [PROSECUTION]: Let me give you some other examples of some people say it
could be or could not be. If a person knows right from wrong, so they're not insane,
but, let's say, they may have a mental illness, a mental birth defect, maybe they're
mentally retarded. There's been a lot in the media lately about the execution of
someone who is mentally retarded. And you can see how Special Issue No. 3 [the
mitigating evidence special issue] could take that into account, that yeah, they're
guilty, they killed the police officer. Yeah, they're probably going to be dangerous. 
They intended for someone to die. But their makeup, they've been that way since
birth through no fault of their own. You can see the documentation if someone is
mentally retarded.


 People say irregardless of those other decisions, that's why we get to No. 3, that
could be, maybe to some people, mitigating.


 [DEFENSE]: Excuse me, Mr. D'Amore. Your Honor, because of the legal nature of
the Supreme Court rulings involving that recently, we object to that as an improper
commitment question under Standifer [sic].


 [TRIAL COURT]: Overruled.[ (8)]


 The prosecution's question did not attempt to bind the veniremember to resolve or refrain
from resolving an issue (i.e., the mitigating evidence special issue) on the basis of one or more facts
contained in the question. See Standefer v. State, 59 S.W.3d 177, 180 (Tex.Cr.App. 2001) (question
is a commitment question "if one or more of the possible answers is that the prospective juror would
resolve or refrain from resolving an issue in the case on the basis of one or more facts contained in
the question"). The totality of the voir dire record reflects that the prosecution explained that the
veniremember should have an open mind and consider all of the evidence in answering the
mitigating evidence special issue. This was not an improper commitment question. See Standefer,
59 S.W.3d at 180-82.

 In point of error sixteen, appellant claims that the following was an improper commitment
question from the prosecution to veniremember O'Brien.

 Q. [PROSECUTION]: That by itself right there, if we just stop for a minute, I can
take a gun out and shoot my partner here ten times and laugh about it and that's
murder. It's not capital murder, but it's an intentional murder. I could get anywhere
from five years in the penitentiary at the low end to 99 years or life at the high end
or anywhere in between. Okay? That's for intentional murder.[ (9)]

 Even if this is a question, appellant did not object to it. He, therefore, failed to preserve any
appellate claim that it was an improper commitment question. See Tex. R. App. Proc. 33.1(a).

 Appellant also claims in point of error sixteen that the following were improper commitment
questions from the prosecution to veniremember O'Brien.

 Q. [PROSECUTION]: You know, it's asked sometimes that you are telling me, Ms.
O'Brien, that you could give somebody as little as five years in the penitentiary for
intentional murder. See? That's how it's phrased. Most people think of murder they
think of the example I gave you, shooting somebody horribly, a very vicious crime. 
Of course, it could be.


 [DEFENSE]: Excuse me, Your Honor, but we're going to object as to any specific
example not contained in the indictment, not reflected by allegations contained in the
indictment so as to qualify a juror as to the range of punishment. We will object to
it, violation of Standifer [sic].


 [TRIAL COURT]: Overruled.


 Q. [PROSECUTION]: Different type of intentional murder could be the unplugging
of a life support machine in the hospital of a family member out of love instead. 
Intentional murder, did it on purpose, knew they were going to die, but you did it out
of love so that person wouldn't be in pain.


 [DEFENSE]: Again, Judge, we renew our objection in that regard.


 [TRIAL COURT]: Overruled.


 Assuming that appellant's objections were sufficient to alert the trial court to a claim that the
prosecution's questions were improper commitment questions, we decide that the prosecution's
questions were not improper commitment questions. They did not attempt to bind the veniremember
to resolve or refrain from resolving an issue (i.e., the minimum punishment for an intentional
murder) on the basis of one or more facts contained in the questions. See Standefer, 59 S.W.3d at
180.

 Appellant also claims in point of error sixteen that the following was an improper
commitment question from the prosecution to veniremember O'Brien.

 Q. [PROSECUTION]: Go down the street, kill a neighbor out in the front yard. 
Intentional murder, not self-defense, not an accident. Then you find out that neighbor
gave drugs to that person's child and killed him, drug dealer, that type of a situation. 
You see, it could encompass a wide variety of the different situations what
intentional murder is.


 I use those as examples not to commit you in any way, but to kind of have you see
intentional murder can encompass a lot of different situations. Does that make
sense?


 A. [O'BRIEN]: Yes.[ (10)]


 Appellant did not object to this question. He, therefore, failed to preserve any appellate claim
that it was an improper commitment question. See Rule 33.1(a).

 In point of error eighteen, appellant claims that the following were improper commitment
questions from the prosecution to veniremember Hamblin.

 Q. [PROSECUTION]: Now, of course, that, I think that wide range of punishment
recognizes the wide range of circumstances that murder can be committed under. 
Maybe a situation where I turn to Mr. D'Amore, I don't like his tie today, and I shoot
him ten times in the head, and, you know, he falls down and, you know, I dance
around all happy about it. It's a brutal, heinous, intentional murder. There's nothing
really plus, it's not a capital murder. You know, it could be something like that,
that's an intentional murder. Or it could be an aged spouse, okay, who pulls the life
support plug-


 [DEFENSE]: Excuse me, Mr. Wirskye. We will object, Your Honor. That's clearly
not something encompassed within the allegations contained in the indictment. It's
an improper example to try to qualify the juror, potential juror, on the minimum
range of punishment. We also think it's a violation of Standifer [sic], it's a
commitment question, so we kindly object.


 [TRIAL COURT]: Be denied.


 Q. Obviously, we can't commit you to what you would do in certain instances. I just
want to kind of give you some examples. A mercy killing, some people call it. You
know, an aged spouse pulls the life support plug to put their longtime spouse out of
misery. That would also be an intentional murder.


 [DEFENSE]: We would also object, that certainly would also be aiding suicide. 
We're going to object to that, but certainly it wouldn't even be in the range of a
murder offense, so we object once again that it's an improper example to be given.


 [TRIAL COURT]: Be denied.[ (11)]

 

 Assuming that appellant's objections were sufficient to alert the trial court to a claim that the
prosecution's questions were improper commitment questions, we decide that the prosecution's
questions were not improper commitment questions. They did not attempt to bind the veniremember
to resolve or refrain from resolving an issue (i.e., the minimum punishment for an intentional
murder) on the basis of one or more facts contained in the questions. See Standefer, 59 S.W.3d at
180.

 In point of error nineteen, appellant claims that the following was an improper commitment
question from the prosecution to veniremember McGinnis.

 Q. [PROSECUTION]: You know, you could have a really heinous murder, just a
regular murder, pull a gun out and kill Mr. D'Amore because I don't like his tie. You
may want to give me life for that. And you could have a knowing or intentional
murder. An elderly spouse pulls the plug on life support for a long-time spouse.


 [DEFENSE]: We object to that example, Judge. It's a violation of Standifer [sic] and
it doesn't qualify here anyway.


 [TRIAL COURT]: Be overruled. Do you understand he's just giving you examples,
Mr. McGinnis?


 A. [MCGINNIS]: I understand that.


 [TRIAL COURT]: I figured you did. We can't talk about the facts of this case, so
we just give hypotheticals. Does that make sense to you.


 A. Yes, sir.


 The prosecution's question did not attempt to bind the veniremember to resolve or refrain
from resolving an issue (i.e., the minimum punishment for an intentional murder) on the basis of one
or more facts contained in the question. See Standefer, 59 S.W.3d at 180. It was not an improper
commitment question.

 Finally, any error in the trial court permitting the prosecution to ask these four
veniremembers these questions was harmless. Our review of the record indicates that none of these
four veniremembers sat on appellant's jury because appellant exercised a peremptory challenge on
each one of them, and that appellant had one peremptory challenge remaining after selection of the
primary jury panel. Cf. Anson, 959 S.W.2d at 204. Points of error fifteen, sixteen, eighteen and
nineteen are overruled.

 The judgment of the trial court is affirmed.


 Hervey, J.


Delivered: June 29, 2005

Publish 

 
1. It appears that this document was prepared just after the escape as an aid to law enforcement
to apprehend the escapees.
2. Rivas was one of the Texas Seven escapees. He was also convicted of capital murder and
sentenced to death for his role in the murder of the police officer during the robbery at the Oshman's
store. This Court affirmed this conviction and sentence on direct appeal See Rivas v. State, No.
74,143 (Tex.Cr.App. No. 74,143, delivered June 23, 2004) (not designated for publication).
3. Tex. R. Evid. 803(6) provides that "records of regularly conducted activity" are not excluded
by the hearsay rule. Rule 803(6) defines "records of regularly conducted activity" as:


 A memorandum, report, record, or data compilation, in any form, of acts, events,
conditions, opinions, or diagnoses, made at or near the time by, or from information,
transmitted by, a person with knowledge, if kept in the course of a regularly
conducted business activity, and if it was the regular practice of that business activity
to make the memorandum, report, record, or data compilation, all as shown by the
testimony of the custodian or other qualified witness, or by affidavit that complies
with Rule 902(10), unless the source of information or the method or circumstances
of preparation indicate lack of trustworthiness. "Business" as used in this paragraph
includes any and every kind of regular organized activity whether conducted for
profit or not.
4. This witness testified:


 Q. [DEFENSE]: If I asked you based on your opinion to rank [appellant] in terms of
intelligence with all the rest of [the Texas Seven] I just asked you about, what would
you say?


 A. [MOCZYGEMBA]: He was right at the very bottom.


 Q. Okay. And I'll ask you again, did TDC ask you that type of information? Did
they ask you to do that type of qualification?


 A. They basically asked us to give them their-how would you say, their physical and
mental characteristics.


 Q. Okay. Did they use terms such as leadership?


 A. Oh, not really, not that I can recall.


 Q. But no doubt in your mind that Rivas was the leader?


 A. Yes, sir.


 Q. And those were-that was consistent with his intelligence and his character as you
knew him?


 A. Yes, sir, that's correct.


 Q. And [appellant] you saw mopping up the floor?


 A. Yes, sir. 
5. This witness testified:


 Q. [DEFENSE]: Okay. What is that opinion?


 A. [BURGESS]: Not very good. [Appellant] was-just in my opinion he was not a
leader type, just that's my opinion.
6. Appellant's counsel argued:


 Who does [appellant] meet? He meets George Rivas. Now, there's some indication
by [the prosecution] somehow that he-and Mr. Rivas had gotten [appellant] and, you 
know, selected him somehow. You know what [appellant] is? He's a follower. No
leadership qualities. Everybody down at TDC has figured that out. Burgess said he's
dumb as a bag of rocks. Tell him what to do. And you look during the course of the
scheme of the conduct. Is he one of the guys with the shank? No. He's the guy with
the mop. What's he doing? He's not even engaging in any independent thought
through the course of the escape. He's waiting until he's being told to do something
and then he does it. And that comes from their witnesses. 
7. Appellant does not state in his brief whether he challenged these veniremembers for cause,
or whether he exercised peremptory challenges on them, or whether any of them actually sat on his
jury. Cf. Anson v. State, 959 S.W.2d 203, 204 (Tex.Cr.App. 1997), cert. dism'd, 525 U.S. 924
(1998) (discussing harm analysis to apply to trial court's refusal to allow proper questions to
individual veniremembers). 
8. After the trial court overruled appellant's objection, the following exchange occurred.


 Q. [PROSECUTION]: Some people might view it as mitigating. That's the only
thing. I'm not trying to commit you one way or the other. I'm just asking do you see
how that could play a part in No. 3.


 A. [RUSSELL]: Yes.


 Q. The bottom line question with Special Issue No. 3 is that you have to have an open
mind to it. You have to be able to look at the evidence and see if there's something
mitigating there, and then is it sufficient in your mind to give them a life sentence,
whether it's because they're mentally retarded or something else about them, some
reason why the crime happened.


 I mean, again, we can sit here all day long and talk about mitigating reasons. But the
bottom line is, even if you can't think of something today, that you're not closing it
off, you're not closing off giving somebody a life sentence.


 So, that's what I need to know, and I think everyone here needs to know whether or
not you are the type of person that can keep an open mind on No. 3, even though
you've found him guilty of killing a police officer, even though you said he's
probably going to be dangerous. Because that's the context in how this question is
asked. The law says you must, because the only way you get to No. 3, you made
those decisions. So, when you get there, you still have to have an open mind to a life
sentence, depending on the facts of the case. 
9. The voir dire record reflects that immediately after this the prosecution continued to explain:


 Q. [PROSECUTION]: I guess you could say, when you find someone guilty of
intentional murder, there may be, what, 94, 95, 96, separate verdicts you could do,
anywhere from five years up to 99 years or life. See how that works?


 A. [O'BRIEN]: Uh-huh.


 Q. What the law says about that is that we can't commit you today on what you'll do
in any particular situation, but what we must know, and both sides are entitled to
know, is that your mind would be open to that full range of punishment, depending
on the facts. Maybe depending on as to why I killed him or as a different situation
does a person, the motive of why it happened, or the reason why it happened. It's not
legally justified, but maybe there's some other reason why it happened.


 All you have to be able to do to satisfy the law is to say you'll have an open mind,
wait to hear the evidence, and then decide what the proper punishment is. And that
makes sense. You don't want to commit to something before you know the full
story. Does that make sense?


 A. Sure.


 Q. Do you think you could do that?


 A. Yes.
10. The voir dire record reflects that immediately after this the prosecution continued to explain:


 Q. [PROSECUTION]: So, that's why the law says you have to wait and hear the
evidence, hear about the person, and then decide what the proper punishment is. My
question to you in an intentional murder case if you are a juror, if you find someone
guilty of intentional murder, could you then decide what the appropriate punishment
is with your mind open from five years to 99 years or life, just depending on the
facts?


 A. [O'BRIEN]: I think so.


 Q. So you could, although you don't have to think of a situation today, your mind is
open to giving someone the minimum five years for an intentional murder, depending
on the facts and if you thought it was the right thing to do?


 A. You mean, if I thought the sentence was the right thing to do?


 Q. Right.


 A. Yes.
11. The voir dire record reflects that immediately after this the prosecution continued to explain:


 Q. [PROSECUTION]: It encompasses a wide range. My next door neighbor gives
my little daughter drugs, and I get mad about it, and I go out in the front yard and
shoot him dead. That's intentional murder. The jury may want to find that pretty
mitigating, you know.


 But, anyway, the bottom line is to all of this, as a potential juror you have to be able
to keep an open mind to that full range of punishment, five all the way up to 99 years
or life.


 Do you think that you would have a hesitation in keeping that open mind to that
entire range of punishment.


 A. [HAMBLIN]: No, sir.